James D. HODGSON, Secretary of Labor,
United States Department of Labor,
Plaintiff,

v.

UNITED MINE WORKERS OF AMER-
ICA et al., Defendants.

Civ. A. No. 3071-64.

United States District Court,
District of Columbia.

May 24, 1972.

---

L. Patrick Gray, III, Asst. Atty. Gen.,
Harland F. Leathers and David Orlikoff,
Attys., Dept. of Justice, for plaintiff.

Edward L. Carey, Harrison Combs,
Willard P. Owens, and Charles L. Wid-
man, Washington, D. C., for defendants.

## MEMORANDUM OPINION

WADDY, District Judge.

This matter having come on for trial
before this Court without a jury and the
Court having considered the evidence,
both oral and written, having reviewed
the pre-trial and post-trial briefs and
heard oral arguments of counsel, and
considered all post-trial submissions by
the parties, and being fully advised in
the premises, makes findings of fact and

conclusions of law as set forth hereinafter in this memorandum opinion.

This is an action originally instituted by W. Willard Wirtz, then Secretary of Labor, United States Department of Labor, by Complaint filed on December 15, 1964. Secretary of Labor George P. Shultz was substituted as Plaintiff by order of the Court on September 11, 1971, and the present Secretary of Labor, James D. Hodgson, was substituted as Plaintiff by order of Court entered June 29, 1971. Plaintiff, by this action brought under Title III of the Labor-Management Reporting and Disclosure Act of 1959 [29 U.S.C.A. § 461 et seq.] (hereinafter called "LMRDA"), seeks to cause the International Union, United Mine Workers of America (hereinafter called "International Union") to terminate alleged trusteeships maintained over seven of its Districts. Said Districts are subordinate bodies of the International Union and subject to its laws.

Defendant International Union is an unincorporated association, maintaining its principal offices at 900 Fifteenth Street, Northwest, in the City of Washington, District of Columbia, and is a labor organization engaged in an industry affecting commerce within the meaning of §§ 3(i) and (j) of the LMRDA [29 U.S.C.A. §§ 402(i) and (j)]. The individual defendants are or were at the time suit was filed, officers of United Mine Worker Districts 4, 6, 7, 17, 23, 30 and 31. The individual defendants were not elected officers by the members in good standing but were appointed as presidents and/or secretary-treasurers of the above-named Districts by the President of the International Union. Districts 4, 7, 17, 23, 30 and 31 are known as "provisional" districts in which all officers are appointed by the President of the International Union subject to approval by International Union's Executive Board. District 6 is known as a "semi-autonomous" district in which the president and secretary-treasurer are appointed by the President of the International Union.

Before bringing this action the Secretary of Labor received written complaints from members in good standing of local unions within the jurisdiction of each of the seven Districts referred to above, alleging that the defendant International Union was violating Title III of the LMRDA (29 U.S.C. § 461 et seq.). More specifically, the complaints alleged that the defendant Union had violated the Act and was continuing to violate the Act by keeping Districts 4, 6, 7, 17, 23, 30 and 31 in trusteeship. The Secretary of Labor, acting pursuant to and in accordance with section 304(a) of the LMRDA (29 U.S.C. § 464(a)), investigated each complaint and found probable cause to believe that violations of Title III of the Act had occurred and had not been remedied in that the defendant Union had imposed trusteeships over Districts 4, 6, 7, 17, 23, 30 and 31, and that continuation of the trusteeships was not necessary for a purpose allowable under section 302 of the LMRDA (29 U.S.C. § 462). The Secretary thereupon began this action as directed by the statute.

The defendant, International Union, vigorously resists these proceedings and contends that the law does not require the election of officers for these districts because they are not labor organizations or intermediate bodies within the meaning of the LMRDA but are administrative arms of the International Union and thus not subordinate bodies in trusteeship.

The Court finds that the districts in question are labor organizations within the meaning of the LMRDA: that they are subordinate bodies of the defendant, International Union, and that the International Union has kept and is keeping said districts in trusteeship in violation of the statute.

Section 3(i) of the LMRDA (29 U.S.C. § 402(i) defines "labor organization" as follows:

'Labor organization' means a labor organization engaged in an industry affecting commerce and includes any

organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization, other than a State or local central body.

Section 3(j) of the LMRDA (29 U.S.C. § 402(j) provides:

A labor organization shall be deemed to be engaged in an industry affecting commerce if it—

(1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended, or the Railway Labor Act, as amended; or

(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

(4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

(5) is a conference, general committee, joint or system board, or joint council, subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection, other than a State or local central body.

Section 101(a) of the LMRDA (29 U.S.C. § 411(a) (1) provides:

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

Section 3(h) of the Act [29 U.S.C.A. § 402(h)] defines trusteeships as follows:

(h) *"Trusteeship" means any receivership, trusteeship, or other method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws.* (Italics supplied).

Section 302 of the LMRDA (29 U.S.C. § 462) provides:

Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.

Section 304 of the LMRDA (29 U.S.C. § 464) provides:

(a) Upon the written complaint of any member or subordinate body of a labor organization alleging that such organization has violated the provisions of this subchapter (except section 461 of this title) the Secretary

shall investigate the complaint and if the Secretary finds probable cause to believe that such violation has occurred and has not been remedied he shall, without disclosing the identity of the complainant, bring a civil action in any district court of the United States having jurisdiction of the labor oganization for such relief (including injunctions) as may be appropriate. Any member or subordinate body of a labor organization affected by any violation of this subchapter (except section 461 of this title) may bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate.

(b) For the purpose of actions under this section, district courts of the United States shall be deemed to have jurisdiction of a labor organization (1) in the district in which the principal office of such labor organization is located, or (2) in any district in which its duly authorized officers or agents are engaged in conducting the affairs of the trusteeship.

(c) In any proceeding pursuant to this section a trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462 of this title. *After the expiration of eighteen months the trusteeship shall be presumed invalid in any such proceeding and its discontinuance shall be decreed unless the labor organization shall show by clear and convincing proof that the continuation of the trusteeship is necessary for a purpose allowable under section 462 of this title.* In the latter event the court may dismiss the complaint or retain jurisdiction of the cause on such conditions and for such period as it deems appropriate. (Italics supplied).

Section 401(d) of the LMRDA (29 U.S.C. § 481(d)) provides:

> Officers of intermediate bodies, such as general committees, system boards, joint boards, or joint councils, shall be elected not less often than once every four years by secret ballot among the members in good standing or by labor organization officers representative of such members who have been elected by secret ballot.

The defendant International Union was organized on January 25, 1890, and is an international labor organization representing, and having as members, workers employed in and around coal mines, coal washeries, coal processing plants, coke ovens, and related industries in the United States and Canada. It is conceded that as originally structured the defendant International Union was divided into three levels: (1) local unions, (2) Districts that are composed of affiliated local unions and their members, and (3) the International Union itself, and that said structure continued until 1930. It is also conceded that as originally formed the districts had power to negotiate collective bargaining agreements with coal companies in their geographical areas, and could elect their own officers and conduct their own affairs. Plaintiff contends that the structure of the defendant labor organization has not changed. On the other hand the Defendant, International Union, argues that commencing in 1930, in order to effectuate a national wage agreement and to prevent the coal operators from pitting one district against another to the detriment of all, the International Union restructured itself into a two-level organization by eliminating the autonomy

of the districts and making them administrative arms of the International Union.

Prior to 1930 the Constitution of the International Union did not expressly authorize the International President to revoke charters of and create provisional governments for subordinate branches. At its convention in 1930 its Constitution was amended to read as follows:

The International Union shall be composed of workers eligible for membership in the United Mine Workers of America, and may be divided into *Districts,* Sub-Districts and Local Unions. The International Union shall have supreme legislative, executive and judicial authority over all members and subordinate branches, and shall be the ultimate tribunal to which all matters of importance to the welfare of the membership and subordinate branches shall be referred for adjustment. Between International Conventions the supreme executive and judicial powers of the International Union shall be vested in its Executive officers and Executive Board in accordance with and subject to the provisions of this Constitution. (Italics supplied).

Article III, Section 2:

All Districts, Sub-Districts and Local Unions must be chartered by, and shall be under the jurisdiction of and subject to the laws of the International Union and rulings of the International Executive Board. *Charters of Districts, Sub-Districts and Local Unions may be revoked by the International President, who shall have authority to create a provisional government for the subordinate branch whose charter has been revoked.* This action of the International President shall be subject to review by the International Executive Board upon appeal by any officers deposed or any members affected thereby. Until such review is had and unless said order of revocation is set aside, all members, officers and branches within the territory affected by the order of revoca-

tion shall respect and conform to said order. An appeal may be had from such order of revocation, to the next International Convention. (Italics supplied).

Pursuant to the above-mentioned constitutional provisions the autonomy of a number of the districts, including that of Districts 4, 6, 7, 17, 23, 30, and 31 has been revoked and the districts placed in "semi-autonomous" or "provisional" status.

At its founding convention the defendant Union divided the coal fields within its jurisdiction into 21 Districts with specific geographical boundaries. From time to time the geographical boundaries of the Districts changed and new Districts were added. At the present time the defendant Union has twenty-three (23) Districts in the United States and two (2) in Canada. Each District has definite territorial boundaries, its own officers and employees, its own bank account and assets, and has jurisdiction over the Union locals situated within its boundaries as defined by the Union Constitution. Of the twenty-three (23) Districts located in the United States only four (4) are "Autonomous" Districts, two (2) are "Semi-Autonomous," and seventeen (17) are "Provisional Districts."

In the nomenclature used by the United Mine Workers an "Autonomous District" is one whose officers are elected by members of the locals within its jurisdiction including the representative who serves on the International Executive Board. Districts 5, 8, 11 and 22 are Autonomous Districts.

A "Semi-Autonomous District" is one in which the members of the constituent locals elect all the officers of the District, including the representative for the International Board, except the President and Secretary-Treasurer who are appointed by the President of the International Union.

A "Provisional District" is one all of whose officers are appointed by the President of the International with the exception of the representative for the

International Executive Board. Prior to 1960 the International President also appointed the International representatives from the Provisional Districts. However, following the enactment of the LMRDA, the International representatives of the "Provisional Districts" are elected at the International Conventions of the Union. This procedure, however, does not always insure that the International representatives will be the actual choice of the membership of the "Provisional Districts" since the nominations for the office are made by a nominating committee whose members are appointed by the International President.

There are seven Districts involved in this action, Districts 4, 6, 7, 17, 23, 30 and 31 as follows:

(a) District 4, originally established in 1890 has jurisdiction over all UMW Local Unions and their members located in the Connellsville and Uniontown coke fields of Pennsylvania. The members of the local union in District 4 have not elected their president and secretary-treasurer since June 14, 1923, when the International President first appointed persons to fill those offices. Nor have the members of District 4 nominated and elected their representative who serves on the International Executive Board.

(b) District 6 was originally established as an antonomous District on April 15, 1890, and was assigned the entire State of Ohio. The jurisdiction of District 6 now includes the Pan Handle District of West Virginia as well as Ohio. The officers of District 6 were elected by its members until 1930 when the District requested the defendant Union to place it in provisional status. The autonomy of District 6 was suspended by the defendant Union in 1931. Partial autonomy was restored in 1939. Since 1939, the members of the local unions attached to District 6 have elected all of their officers except president and secretary-treasurer who continue to be appointed by the International President.

(c) District 7 was established as an "Autonomous District" in 1898. A charter was issued to District 7 by the defendant Union on April 27, 1903. The members of District 7 elected their own officers until 1941 when the defendant Union revoked the District's charter and placed it in provisional status. District 7 was maintained in provisional status until March 20, 1969, when it was consolidated with UMW Districts 1 and 9 to form a new Provisional District 25.

Prior to the consolidation both Districts 1 and 9 were "Autonomous Districts" having the right to elect their own officers and International Executive Board member, and operate under their own constitutions. The autonomy of District 1 was revoked on August 8, 1968, when the defendant Union placed it in provisional status, a status which continued until District 25 was established.

(d) District 17 was established as an "Autonomous District" in April, 1890, and was assigned jurisdiction over the State of West Virginia. Its autonomy was suspended temporarily by the defendant Union from January 21, 1916, until January 1, 1917. District 17 remained autonomous until June 16, 1924, when its autonomy was again revoked and a provisional government established. The defendant Union has appointed the president and secretary-treasurer of District 17 continuously since 1924.

(e) District 23 was established as an "Autonomous District" in 1892 and was assigned the territory of southwestern Kentucky and Tennessee south of Chattanooga. The District remained autonomous until the early 1930's when the defendant Union revoked District 23's autonomy and established a provisional government. Until its autonomy was suspended District 23 elected its own officers and its International Executive Board members, and operated under its own constitution. The International President has appointed District 23's president and secretary-treasurer continuously since the 1930's.

(f) District 30 was established in January 8, 1920, and assigned jurisdiction over eastern Kentucky. Prior to January 8, 1920, the members of the

UMW Local Unions located in eastern Kentucky had belonged to autonomous District 17. When District 30 was established it was issued a charter. District 30 is a "Provisional District" and its president and secretary-treasurer are appointed by the International President.

(g) District 31 was established in March, 1926, and was issued a charter dated May 1, 1926. District 31 has jurisdiction over all UMW local unions and their members located in northern West Virginia. The members and local union which constitute District 31 were formerly affiliated with autonomous District 17. District 31 is a "Provisional District" and its president and secretary-treasurer are appointed by the International President.

As originally established the Districts had a large degree of autonomy. They elected all of their own officers, including their representatives on the International Executive Board. They negotiated separate collective bargaining agreements with employers dealing with wages, hours, and the terms and conditions of employment and handled their own grievances. However, during the 1920's the coal industry fell into depression; there were strikes, mine shutdowns and wide-spread unemployment. The coal operators pitted District against District to the general detriment of all coal miners and in this manner precluded any wage stability in the industry. In an attempt to overcome these problems the International Union began to curtail the activities of the Districts although they continued to exist as intact organizations.

With the revival of the coal industry in the early 1930's many of the Districts were placed in Provisional status and their officers appointed by the International President in order to provide for efficient operation of the Districts and to enable the International Union to negotiate industry-wide collective bargaining agreements. Following the enactment of the National Industrial Recovery Act [48 Stat. 195 (1933)], the International Union and Districts 2, 3, 4, 5, 6, 17, 30 and 31, as joint signatories, negotiated the Appalachian Agreement with coal operators covering all producers in the Appalachian Territory.

At the trial of the case the defendants contended that in the early 1930's the United Mine Workers organization restructured itself from a three-tier organization to a two-tier organization and that as a result of such restructuring the Districts are not labor organizations but are administrative arms of the International Union. This argument is specious. The Districts were just as much administrative arms of the International Union prior to 1930 as they are now. The "restructuring", if any, was not of the International Union but of the Districts themselves. The International Union merely destroyed or restricted the autonomy of the Districts and centered the effective administration and control of the Districts in itself. It was understood and always recognized that the loss of autonomy and the restrictions placed on the Districts during the 1920's and 1930's were temporary measures and that autonomy would be restored to the Districts when stability returned to the industry. Notwithstanding this understanding after stability had returned to the industry and industry-wide wage agreements had been negotiated, the International Union concluded that control of the Districts made it a more effective organization and that it was in the best interests of the International Union to keep these Districts in provisional and semi-autonomous states. Accordingly, it has rebuffed all demands by the individual members to comply with the original understanding and restore autonomy to the Districts.

The evidence shows that the Districts had and continue to have all the indicia of labor organizations. With the exception of the fact that they recognize the right of the International Union to negotiate the basic wage agreement (although they still join as signatories), there has been no change in the character

and functions of the Districts since the International Union undertook to negotiate collective bargaining agreements:

(a) District 4 is composed of fifty (50) local unions having approximately 8,500 members. This District maintains its own checking account in the National Bank of Washington which contained $40,285 as of December 31, 1970. District 4 maintains an office and pays its own rent out of District funds, has its own employees, and had at the end of 1970, $20,000 in fixed assets. The local unions attached to District 4 send delegates to District Conventions where a scale committee is elected and resolutions are debated, voted on and forwarded to the International Convention. The officers and employees of District 4 attempt to organize non-union mines, handle grievances and deal with employer-coal operators regarding strikes and other labor disputes. District 4 has also levied fines on local unions which engage in unauthorized work stoppages.

(b) District 6 is presently composed of approximately 100 local unions having approximately 8,500 members. District 6 operates under its own Constitution which is amended by delegates from local unions at the District's quadrennial convention. District 6 maintains its own bank account in the National Bank of Washington which contained $14,100 as of December 31, 1970; owns personal property, has employees whose salaries are out of District funds as is the monthly rent on the office used by the officers of the District; and levies assessments on members of the local unions as authorized by the District Convention to maintain a legal department.

District 6's Executive Board reviews appeals taken from local union disciplinary proceedings and formulates activities to be taken in organizing non-union mines. The officers of District 6 deal with employer-coal companies regarding grievances, seniority, vacations, holiday pay, labor disputes and the terms and conditions of employment. As a result of negotiations with coal operators District 6 has entered into memoranda of understanding with the employers.

(c) Prior to its consolidation with Districts 1 and 9, District 7 had its own bank account in the Peoples First National Bank of Hazelton, Pennsylvania, paid rent for office space, had employees and participated as a member of the Tri-District Conference which negotiated with coal companies in the anthracite industry. The officers of District 7 ruled on appeals taken from disciplinary actions of locals, settled grievances and labor disputes, dealt with management regarding proper rates of pay and organized non-union mines.

District 7 was kept in provisional status until March 20, 1969, when it was consolidated with UMW Districts 1 and 9 to form a new provisional District 25. Prior to the establishment of District 25 both Districts 1 and 9 were autonomous, elected their own officers and had their own constitutions. The members of Districts 1 and 9 also elected their representative who served on the International Executive Board. Districts 1 and 9, and their officers performed the same functions as did District 7 with regard to the handling of grievances, labor disputes, intra-union appeals and collective bargaining. The autonomy of District 1 was revoked on August 8, 1968, when the defendant Union placed it in provisional status, a status which continued until the consolidation.

(d) District 17 is composed of 96 local unions with approximately 12,000 members. The District maintains a bank account in the National Bank of Washington which contained $30,957.00 as of December 31, 1970; owns personal property; has employees whose salaries are paid out of District funds, and levies assessments on the members within its jurisdiction. District 17 negotiates and executes memoranda of understanding with employer coal companies relating to seniority, paid holidays and working conditions, discusses questions arising under the collective bargaining agree-

ment, handles grievances, and attempts to settle unauthorized work stoppages.

(e) District 23, which has approximately 6,157 members, has a checking account which contained $21,314.00 as of December 31, 1970, and fixed assets valued at $15,000.00, employees and an attorney whose salaries are paid out of District funds, as are taxes and insurance premiums. District 23 negotiates contracts with employer-coal companies dealing with work jurisdiction and vacancies, organizes non-union mines, handles grievances, and settles disputes with employers. District 23 also rules on appeals taken by union members involving local union election disputes and fines.

(f) District 30, which has approximately 9,004 members, has a checking account in the National Bank of Washington which contained $32,785.00 as of December 31, 1970 and fixed assets valued at $8,800.00. During 1970 District 30 collected $28,656.00 in assessments levied on its members.

Although District 30 does not hold conventions, the District calls all local union officers together once or twice a year to discuss District affairs. District 30 organizes non-union mines using district representatives and organizers whose salaries and expenses are paid for out of District funds. The officers and representatives of District 30 contact coal companies who are not parties to the national agreement to get them to sign collective bargaining agreements. District 30 deals with employer-coal companies regarding grievances, holiday pay, labor disputes and general working conditions. As a result of those discussions, memoranda of understanding have been entered into by District 30 and the coal companies. The District President selects the persons who represent District 30 in the grievance procedure set forth in the National Bituminous Coal Wage Agreement.

(g) District 31 is composed of 79 local unions having approximately 13,000 members. Following each international convention District 31 holds a convention for the purpose of electing representatives who serve together with the District officers on the National Policy Committee which handles all resolutions concerning wages and working conditions prior to the negotiation of the national collective bargaining agreement. District 31 maintains checking accounts in the National Bank of Washington which contained $23,718.00 as of December 31, 1970; owns stock in the First National Bank of Fairmont and the Monongahela Power Company, and has fixed assets valued at $3,500.00. District 31 organizes non-union mines and contacts independent coal mine operators to get them to sign collective bargaining agreements, negotiates contracts with employer-coal companies, handles grievances and disputes arising under the National Bituminous Coal Wage Agreement, and levies fines on local unions which engage in unauthorized work stoppages. The District also renders final rulings on appeals taken by members involving local union election disputes.

The evidence in this case shows further that Districts 4, 6, 7, 17, 23, 30 and 31 have been parties to proceedings before the National Labor Relations Board and have been found by that agency to be labor organizations engaged in an industry affecting commerce within the meaning of the National Labor Relations Act (29 U.S.C. § 152(5)), and Districts 4, 6, 7 and its successor 25, 17, 30 and 31 have applied for and been granted exemptions from Federal Income Tax under the Internal Revenue Code on the ground that they were labor organizations. In granting exemptions to these Districts the Internal Revenue Service recognized each District as a separate entity. In addition to Districts 4, 6, 7 and its successor 25, 17, 30 and 31, the Internal Revenue Service has also granted exemptions to UMW Districts 1 and 9 which have been consolidated with District 7 into District 25.

■■ It is abundantly clear from the foregoing evidence that the Districts of the United Mine Workers organization are "labor organizations" engaged in an

industry affecting commerce within the meaning of sections 3(i) and (j) of the LMRDA (29 U.S.C. § 402(i) and (j), and are "subordinate bodies" within the meaning of section 3(h) of said Statute (29 U.S.C. § 402(h). It is equally clear that the defendant, International Union, placed the subject Districts in trusteeship more than eighteen months ago. The statute (29 U.S.C. § 464) mandates that any such trusteeship is presumptively invalid and ". . . its discontinuance shall be decreed unless the labor organization shall show by clear and convincing proof that the continuation of the trusteeship is necessary for a purpose allowable under section 462 of this title." Assuming the validity of the original reasons for placing the subject districts in trusteeship years ago, those conditions do not now exist and the defendant, International Union has failed to produce before this Court clear and convincing proof that the continuation of these trusteeships at this time is necessary for any purpose allowable under 29 U.S.C. § 462.

In 1962, prior to the institution of this case, the Department of Labor made an administrative ruling to the effect that Districts of the defendant International Union created *de novo* without autonomy were not considered trusteeships within the meaning of the LMRDA. This ruling remained in full force and effect until February, 1970, when it was changed after the Department of Justice advised the Department of Labor that this interpretation would be a serious obstacle in this case because it appeared from its pleadings that the International Union would attempt to prove that all the Districts were originally created *de novo* as provisional and never had any autonomy to be suspended.

■ At trial and in its pre-trial and post-trial submissions the International Union did urge that as a part of its "restructuring" in the 1930's, the Districts were created *de novo* as administrative arms of the International Union, without autonomy. It argues also that it relied upon the original ruling of the Department of Labor with respect to the creation of provisional districts *de novo* and that plaintiff is estopped from changing that ruling or relying upon the changed ruling with respect to this litigation. This Court is not persuaded by these arguments. The International Union adopted and maintained its system of provisional districts years prior to the ruling of 1962 and without regard to it. The Court has already determined that there was no restructuring in the 1930's of the International Union from a three-tier to a two-tier organization. Consequently, there could be no establishment of the subject districts *de novo* as a part of this alleged but non-occurring process. In the light of that determination the ruling is not applicable to the subject districts, either in the original or changed version, and does not affect the rights of the defendant, International Union, in this proceeding. Thus, the conditions for estoppel do not exist. Furthermore, "[e]stoppel will not be applied where it would frustrate the purpose of the laws of the United States or thwart its public policy." 28 Am.J.2d "Estoppel and Waiver", § 132.

■■ The law and public policy of the United States applicable to this situation has been declared by the LMRDA. The action of the defendant Union of taking away, withholding or deferring autonomous rights which would otherwise be available to and exercised by the Districts constitutes the imposition of a trusteeship within the meaning of section 3(h) of the LMRDA (29 U.S.C. § 402 (h)). By establishing provisional governments over the Districts and by appointing officers to conduct their affairs the International Union suspended the autonomy otherwise available to such Districts and placed them in trusteeship within the meaning of section 3(h) of the LMRDA (29 U.S.C. § 402(h)); and has maintained and continued such trusteeship in violation of Section 304(c), 29 U.S.C. § 464(c) and Section 302 (29 U.S.C. § 462) of that Statute.

Upon consideration of all the foregoing, this Court has concluded that the Defendant, International Union, is in violation of Title III of the LMRDA by imposing and maintaining trusteeships over Districts 4, 6, 7, 17, 23, 30 and 31, and their successors as shown by the evidence, for more than eighteen months, and that the continuation of such trusteeships is not necessary for a purpose allowable under section 302 of the LMRDA (29 U.S.C. § 462). Accordingly, the discontinuance of said trusteeships will be decreed and an order entered enjoining the maintaining thereof and providing for the election of officers and members of the Executive Board and such other actions as may be necessary in each of said Districts, to effectuate the purposes of Title III of the LMRDA.

Plaintiff shall submit a proposed order in compliance herewith within 20 days from the date hereof.