UNITED STATES of America, Plaintiff,

v.

AN ARTICLE . . . ACU–DOT . . ., Defendant,

and

Acu-dot Corp., Claimant-Intervenor.

Nos. C 79–2041, C 79–2331 and C 79–2332.

United States District Court, N. D. Ohio, E. D.

Feb. 11, 1980.

Randolph Baxter, Cleveland, Ohio, for the United States.

William R. Holland, Akron, Ohio, for defendant.

## MEMORANDUM OPINION AND FINAL ADJUDICATION

LAMBROS, District Judge.

This action is the result of a libel of information brought by the United States of America for the condemnation of numerous cases of an over-the-counter medical device called an Acu-dot, as provided for in 21 U.S.C. § 334.[1] The American firm that

markets the seized devices, Acu-dot Corp., was the sole claimant-intervenor responding to the published notice of the *in rem* action. The Court has been very much aware throughout the pendency of this action that the economic viability of Acu-dot Corp. is exclusively founded on its ability to market the *res* of this action, and therefore granted claimant-intervenor's request for expedited trial.

Both libellant and claimant-intervenor have shown exemplary concern for the issues at the heart of this matter, and, in order to allow this Court to reach those issues, streamlined the proceedings of the action through a series of stipulations and voluntary withdrawals of motions prior to trial. As a result, the sole issue presented to this Court at trial was this: are the Acu-dot devices 'misbranded' within the meaning of 21 U.S.C. § 352?

In simple terms, the Acu-dot is a small, pin-head sized magnet attached to the underside of a circular, adhesive patch. It is sold to the public in sheets of ten, packaged in a flat, cardboard box. Inside the box, in addition to the sheet of ten Acu-dots, can be found a four-page pamphlet, purporting to be instructions for the use of the device. The obverse of the cardboard box reads in this way:

ACU–DOT

Magnetic Analgesic Patch

For temporary relief of occasional minor aches and pains of muscles and joints. Contains 10 Patches

The reverse is labelled in this way:

ACU–DOT

Magnetic Analgesic Patch
Mfg. for Acu-Dot Corp. Box F 598, Akron, Ohio 44308
Directions for use:

---

1. All three companion cases involve seizures of the Acu-dot devices at various locations in the Cleveland, Ohio area. At the time of trial, notice by publication had not fully run in the cases number C 79–2331 and C 79–2332. However, no intervenors filed with the Court in those actions, and the parties to C 79–2041, agreed that they would be bound in the later actions by the decision of this Court in C 79–2041. Notice by publication in C 79–2041 had been properly completed at the time of trial.

Apply fingertip pressure to sensitive area to determine point or points of sharpest pain or discomfort. Thoroughly clean and dry area and apply an adhesive-backed ACU–DOT to each such point.

Complete adhesion of the ACU–DOT is recommended. Leave ACU–DOT in place for a two-to five-day period, then procedure may be repeated as needed for continued symptomatic relief.

If itching, rash or other skin irritation occurs, discontinue use. If pain or soreness persists for ten days or longer, discontinue use and consult a physician. Keep this and all medicines out of the reach of children.

FOR EXTERNAL USE ONLY

MADE IN U.S.A.

Manufactured under U.S.A. Patent No. 4162672

The pamphlet insert merely enlarges on the information presented by the outer packaging, adding, however, that the device is "Not a pill. Not a drug. Easy to use."

Libellant claims that the Acu-dots are "misbranded", as that term is used in 21 U.S.C. § 352, in that the labeling is "false or misleading" (subsection (a)) and "fails to bear adequate directions for use" (subsection (f)(1)). The res is therefore subject to seizure under 21 U.S.C. § 334. Claimant-intervenor did not contest the applicability of these sections of the Food and Drug Act to the res.

Defense of the res was made on several grounds. Claimant-intervenor denied that the res was "misbranded" and further argued that the government was estopped from asserting that the res was misbranded because of alleged representations by the Food and Drug Administration that the labeling of the devices would not violate any aspect of Food and Drug Act statutes or regulations.

Trial of the action was held to the bench, trial by jury having been waived by claimant-intervenor so that an expedited hearing could be had.

I.

The majority of the evidence presented both by the government and by claimant-intervenor went to the first of the two "misbranding" issues—is the labeling "false or misleading in any particular"? 21 U.S.C. § 352(a). Libellant, in presenting its case, specifically attacked the descriptions of the devices as "magnetic analgesic patch[es]" and "for temporary relief of occasional minor aches and pains of muscles and joints".

Libellant offered the testimony of three experts—one biophysicist and two medical doctors. These experts were adduced to show that none of the theories offered by claimant-intervenor were valid explanations for the mechanism by which the devices were to achieve their results. Further, each expert testified to his belief that the devices could not achieve the effect alleged by the labeling, other than through a placebo effect.[2]

On behalf of the effectiveness of the res, claimant-intervenor presented several theories for the mechanism of the device. At various times, it was suggested that the magnetic action of the device 'drew' blood to the affected area, which action had the therapeutic effect; that the blood, being composed in part of iron-based chemicals, produced an electromotive force within the body when passing through the field of the magnet, much in the way electric generators produce electricity by moving an electric wire through a magnetic field; that the pressure of the device against the skin creates therapeutic effects in a way analogous to acupuncture techniques; that the ionization of molecules in the skin area under the magnet caused the therapeutic effect claimed; and, finally, that the claimed ben-

2. The "placebo effect" in simple terms can be described a curative effect caused by a biologically inert substance that can be attributed more to the mental relief of the patient than to any effect of the drug or device on the disorder. The most commonly-known placebo is the 'sug-

ar pill'. One important attribute of the placebo is that it has its effect only because the patient believes it will work. An unbelieving patient will not be cured by the effect (or lack thereof) of a placebo.

eficial effect of the device was achieved largely as a result of the psychosomatic placebo response.[3] These various theories were suggested by the teachings of the patent said to include the *res* [U.S. patent # 4,162,672], by the theories presented in an article written by Kyoichi Nakagawa, M.D., one of a number of Japanese researchers attempting to analyze the mechanism of an identical device now in wide currency in Japan, and, most importantly, by the empirical results of an experiment conducted by Rocco Antenucci, M.D., an Akron area family physician who testified at the hearing.

The most impressive evidence on behalf of the *res* was the result of the Antenucci study. That study purported to be a double-blind comparison of the Acu-dots with non-magnetized facsimiles. Of the 70 patients receiving the facsimiles, 10 indicated some degree of pain relief. Of the 152 patients receiving the Acu-dots, 138 reported some degree of pain relief. These figures are impressive and argue strongly for the therapeutic claims.

However, each of the government witnesses was able to suggest major flaws in the conception and execution of the test protocol. Considerable doubt was also cast on the Nakagawa study and the Court was finally left with this problem: libellant could demonstrate that the therapeutic claims of the device could not be explained by any reasonable theory that did not rely on a "placebo" explanation, but had no empirical evidence of the lack of efficacy; claimant-intervenor had very weak theoret-

ical support for the mechanism of the device, and vested its claims in unexplained empirical evidence.

The lack of empirical evidence on the part of libellant is not an insurmountable deficiency. Exactly the same evidentiary situation was presented to the Second Circuit in *United States v. Andreadis*, 366 F.2d 423 (2d Cir. 1966), in a dispute involving the effectiveness of "diet pills," and the court had no difficulty determining that the government's evidence was sufficient to prove its cause.

After careful consideration of all of the evidence, this Court finds that any therapeutic value of the *res* is the result of its placebo effect, and that this placebo effect is very strong in the case of ailments for which the device is claimed effective. Thus, the device often can achieve its claims of providing "temporary relief of occasional minor aches and pains of muscles and joints"; but this effect is the result of nothing more than sophisticated marketing chicanery.

■ This Court hastens to affirm here its belief in the right of the American public to seek any treatment it wishes, especially when that treatment is a harmless, if ineffective, drug or device. The Court further wishes to make plain that it in no way desires to allow a governmental agency to emasculate the constitutional right to seek desired medical treatment enunciated in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). There is a difference, however, between the right to *use* a harmless, ineffective drug or device and a

---

**3.** This last theory—the 'placebo effect'—cannot be dismissed lightly. Expert witnesses testified that current medical theory explains the placebo relief of pain as being mediated by the release of 'endorphins' within the body. A lay explanation of this process is that because the patient believes the placebo will have an analgesic effect, administration of the placebo will cause the patient's body to release small amounts of a morphine-like chemical that is usually dormant within the cells of the body. The morphine-like chemical—the 'endorphin'— then produces the analgesic effect. This explanation suggests to the Court that a placebo cannot be dismissed as 'ineffective' simply because it works its effect in a way more oblique

than standard therapeutic treatments. As is seen *infra* in this opinion, the real difficulty of this case is that a 'placebo' can work only by means of the artifice of its presentation to the patient—the patient must be misled as to its inherent effectiveness. This artifice is the heart of the negative aspects of a placebo, for the composition of the placebo is largely irrelevant to its effectiveness, and a sugar pill of minimal cost to the patient should theoretically be as effective as a $500 device. The person marketing the $500 device is misleading the buyer because the seller claims that the $500 device relieves pain, when it is really the patient's belief in the device that relieves pain. The potential for abuse is obvious.

claimed right to promote and profit from the drug or device. [Testimony of the claimant-intervenor's corporate representative at trial suggested that the Acu-dot business, in its short-lived appearance in the over-the-counter drug market, was lucrative.] Judge Bohanon, speaking for the district court for the Western District of Oklahoma, explained this distinction in *Rutherford v. United States*, 438 F.Supp. 1287 (1977), at 1300–1301:

> When certain "fundamental rights" are invoked, such as the right of privacy involved herein, regulation may be justified only by a "compelling state interest," and legislative enactments "must be narrowly drawn to express only the legitimate state interests at stake," *Roe v. Wade, supra*, 410 U.S. at 155, 93 S.Ct. at 728. By denying the right to use a nontoxic substance in connection with one's own personal health-care, FDA has offended the constitutional right of privacy.
>
> This court's decision in this case in no way portends the return of the traveling snake oil salesman. As emphasized earlier, the right to use a harmless, unproven remedy is quite distinct from any alleged right to promote such. FDA is fully empowered under other statutory provisions to combat false or fraudulent advertising of ineffectual or unproven drugs.

██ This Court resists the impulse to allow claimant to market a product that works only by means of a placebo effect on the basis that it nevertheless often achieves a relief of pain as claimed. The strong placebo effect may save the *res* from claims of "false labeling" under 21 U.S.C. § 352(a), but it does not protect the device from the charge that the labeling is "misleading" under 21 U.S.C. § 352(a), and that is all that is required to warrant condemnation of the *res. United States v. One Device*, 224 F.Supp. 265 (D.C.Pa., 1963). The device's label is "misleading" because the device is not *inherently* effective, its results being attributable to the psychosomatic effect produced by the advertising and marketing of the device. A kiss from mother on the affected area would serve just as well to relieve pain, if mother's kisses were marketed as effectively as the Acu-dot device.

This Court finds that the device is "misbranded" under 21 U.S.C. § 352, and properly subject to seizure and condemnation under 21 U.S.C. § 334, even though the claims are not technically false, because the claims are inherently misleading. *United States v. One Device, Etc.*, 160 F.2d 194 (10th Cir. 1947).

## II.

This Court's decision that the *res* is misbranded as set forth in 21 U.S.C. § 352(a) makes it unnecessary to decide the question of misbranding under subsection (f)(1). Claimant-intervenor, however, claims that the government should be estopped from its allegation of misbranding because it had previously represented to Acu-dot Corp. that the labeling would be appropriate and within the parameters of the statute.

██ Testimony was heard concerning oral representations that had been made to claimant-intervenor by officials at the F.D.A., which testimony was contested by the government. Upon a close review of all the evidence at trial, this Court is of the opinion that the letter of November 8, 1978, from the F.D.A. to the corporation [plaintiff's Exhibit 11], rejecting the 510(k) notification by the corporation, gave claimant sufficient notice that the labeling was not satisfactory. Admittedly, the 510(k) application to which the letter was a response [plaintiff's exhibit 9], proposed labeling different from the labeling finally used on the *res*, but the variances are in no way substantive. In addition, because of the importance of this case to the public welfare, estoppel against the government would work harm to the public by defeating the protective goals of the statute. *E. g., Hodgson v. United Mine Workers of America*, 344 F.Supp. 990 (D.C.D.C., 1972), *aff'd* 155 U.S.App.D.C. 24, 475 F.2d 1293.

██ Claimant-intervenor has attempted to assert that the existence of a patent covering the *res* demonstrates its effectiveness because of the 'presumption of validi-

ty', statutorily created by 35 U.S.C. § 282. This presumption is, however, not conclusive, but merely gives the grant substance and value. *Westinghouse Electric Co. v. Formica Insulation Co.*, 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316 (1924). Even if the 'presumption' were applicable here, the evidence of libellant is sufficient to overcome it.

### III.

■ The *res* is properly seized and condemned and this Court must now consider the possibility of salvage of the components of the device. This Court is of the opinion that the claimant-intervenor believed in the efficacy of its product, and, in view of the harmlessness of the device, that destruction of the seized *res* is not necessary.

The statutory provisions concerning disposition of seized goods, at 21 U.S.C. § 334(d)(1), state that the Court "may by order direct that such article be delivered to the owner thereof to be . . . brought into compliance with the provisions of this chapter under the supervision of an officer or employee duly designated by the Secretary . . .." There are a number of uses to which the device or its components might be put that would not violate the provisions of the Food and Drug Act, and there is also the possibility of limited distribution of the device to qualified researchers for further testing of its efficacy.

### IV.

*FINDINGS OF FACT:*

1. Claimant-intervenor is the corporation engaged in marketing the *res* of this action in the United States.

2. The *res* of this action, called an "Acu-dot", consists of a small, pin-head sized magnet, attached to the underside of a circular, adhesive patch.

3. The *res* of this action was seized by the government from a Revco drug store, located at 3030 Quigley Road in Cleveland, Ohio.

4. The *res* of this action was being held at the Revco store for the purpose of sale to the public, after having been transported there across state boundaries.

5. The Acu-dots are sold to the public in sheets of ten, packaged in a flat, cardboard box.

6. The outside of the cardboard box is clearly labeled with the words, *inter alia*, "Magnetic Analgesic Patch" and "For temporary relief of occasional minor aches and pains."

7. The Acu-dot is not inherently capable of providing temporary relief from occasional minor aches and pains. Further, the Acu-dot is not inherently capable of creating an analgesic effect.

8. The Acu-dot can in some instances provide temporary relief of occasional minor aches and pains purely through its effect as a placebo.

9. The Acu-dot poses no serious health hazards to users.

10. Officials of the Food and Drug Administration informed claimant-intervenor by letter of November 8, 1978, that proposed labeling for the Acu-dot that varied in no important way from the Acu-dot's final labeling was not satisfactory and would be in violation of the Food and Drug Act.

*CONCLUSIONS OF LAW:*

1. The *res* of this action is "misbranded", as set forth in 21 U.S.C. § 352(a) because its labeling is "misleading."

2. The *res* of this action is properly seized and condemned, as provided for in 21 U.S.C. § 334.

3. The government is not estopped from bringing this action by any representations officials of the Food and Drug Administration made to claimant-intervenor.

Consequently, claimant-intervenor is given 90 days from the date of judgment to file a $1,000 bond with the Court, which bond will be forfeited if the devices are disposed of or sold contrary to the provision of the Food and Drug Act. Upon filing of the bond, the seized devices shall be delivered to claimant-intervenor, who may either

destroy the devices or make petition to the Secretary of Health, Education and Welfare, describing in what manner the devices will be properly disposed of. Upon the Secretary's approval, claimant-intervenor may then dispose of the devices in accordance with the petition, and, having properly done so, may recover its bond 60 days thereafter, less the supervisory expenses of the Secretary.

IT IS SO ORDERED.