**WESTERN STATES MEDICAL CENTER, a Nevada Corporation; Women's International Pharmacy, a Wisconsin corporation; Health Pharmacy, a Wisconsin corporation; Apothecure, a Texas corporation; College Pharmacy, a Colorado corporation; Lakeside Pharmacy, a Tennessee corporation; and Wedgewood Village Pharmacy, a New Jersey corporation, Plaintiffs,**

v.

**Donna SHALALA, in her official capacity as Secretary, United States Department of Health and Human Services, and Michael A. Friedman, in his official capacity as Acting Commissioner, United States Food and Drug Administration, Defendants.**

No. CV–S–98–01650(DAE)(RLH).

United States District Court, D. Nevada.

Sept. 16, 1999.

Holleb & Coff, Matthew Murer, Howard M. Hoffmann, Michael A. Reiter, Chicago, IL, Lionel, Sawyer & Collins, Samuel S. Lionel, Las Vegas, NV, for plaintiffs.

Kathryn E. Landreth, U.S. Attny, Blaine T. Welsh, Asst U.S. Attny, Las Vegas, NV, Gerald C. Kell, Sen Trial Cnsl, Office of Consumer Litigation, DOJ, Washington, DC, Patricia J. Kaeding, Assoc Chief Cnsl, Food & Drug Admin, Rockville, MD, of counsel, for defendants.

### ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFFS' CROSS–MOTION FOR SUMMARY JUDGMENT

DAVID ALAN EZRA, Chief Judge.

The court heard the parties' motions on June 22, 1999. Michael A. Reiter, Esq., and Howard M. Hoffman, Esq., appeared at the hearing on behalf of Plaintiffs; Gerald C. Kell, Esq., Patricia J. Kaeding, Esq., and Blaine T. Welsh, Esq., appeared at the hearing on behalf of Defendants. After reviewing the Motions and the supporting and opposing memoranda, the court DENIES Defendants' Motion for Summary Judgment and GRANTS Plaintiffs' Cross–Motion for Summary Judgment.

## I. BACKGROUND

This case involves a First Amendment challenge to Section 503A of the Food and Drug Modernization Act of 1997 (the "Modernization Act"), codified at 21 U.S.C. § 353a (" § 353a"). The Modernization Act exempts "compounded drugs" from the standard drug approval requirements imposed by the Food and Drug Administration ("FDA"). However, §§ 353a(a) and (c) condition this exemption on drug providers agreeing to not promote or advertise particular compounded drugs. Plaintiffs are licensed pharmacists seeking to enjoin the enforcement of these subsections of § 353a, contending that they violate the First Amendment's guarantee of free speech.[1]

### A. Factual Background

Compounding is the process by which a pharmacist combines, mixes or alters ingredients to create a medication that serves the unique needs of specific patients. Pharmacists may provide compounded drugs to individual patients upon receipt of a valid prescription. Such drugs are produced for a variety of reasons, such as when the patient is allergic to an ingredient in the product or when the product is not available in the proper dosage. It is a process that is taught as part of the standard curriculum at most pharmacy schools, and most states have laws requiring that pharmacists have sufficient education and equipment to provide some compounding services.

---

1. Plaintiffs' challenge here is focused on §§ 353a(a) and (c), which, taken together, restrict the advertisement or promotion of compounded drugs as well as the solicitation of business associated with their production. However, in their Complaint, Plaintiffs also challenge § 353a(b)(3), which limits the distribution of compounded drugs to no more than five percent of the total prescription orders dispensed outside the state, unless a Memorandum of Understanding ("MOU") is developed between a state and the Secretary of Health and Human Services which "addresses the distribution of inordinate amounts of compounded drug products interstate and provides for appropriate investigation by a State agency of complaints relating to compounding drug products distributed outside such States...." In such a case, up to 20% of pharmacists' total orders distributed in interstate commerce may constitute compounded drugs. To this date, the Secretary has not developed an MOU with any state. Moreover, the Secretary issued a "Guidance for Industry on Enforcement Policy during Implementation for Section 503A for the Federal Food, Drug and Cosmetic Act," which states that the FDA will exercise its discretion to not enforce § 353a(b)(3) "[until] at least 90 days after the standard MOU is finalized and made available to the States for their consideration and signature." Because the FDA has agreed not to enforce this Section, Plaintiffs are not currently seeking injunctive relief with respect to § 353a(b)(3).

Plaintiffs are eight licensed pharmacies located in seven states. In addition to providing traditional pharmaceutical services, they regularly compound drugs in order to meet the specific needs of individual patients. To accomplish this task, Plaintiffs maintain that they have each pursued individual specializations in the compounding of certain drugs. As a result, compounded drugs represent between 60% and 90% of Plaintiffs' total drug orders.

According to Plaintiffs, they have traditionally advertised their compounding services in order to both promote their products and inform physicians and patients of the variety of available compounded drugs. Plaintiffs explain that the compounding process requires them to consult with physicians and patients, and in some cases, make recommendations about the proper combination of drugs. Accordingly, they have prepared written promotional materials that they distribute both by mail and at medical conferences, and they often include studies and other research to inform consumers and physicians of the uses and effectiveness of specific compounded drugs.

### B. *Statutory History and Framework*

The Federal Food, Drug and Cosmetic Act (the "FDC Act"), 21 U.S.C. § 355(a), imposes stringent conditions on the manufacture and distribution of new drugs.[2] The FDC Act imposes numerous requirements on the approval of new drugs, and provides that "[n]o person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application ... is effective with respect to such drug." § 355(a). All new drugs must comply with these requirements unless Congress has provided an explicit exemption.

Historically, while the FDA has subjected new drugs to its requirements, it has permitted pharmacists to *compound* drugs without meeting these stringent safety standards. In accordance with this policy, prior to the enactment of the Modernization Act in 1997, the FDA had never exercised its authority to subject compounded drugs to the FDC Act's requirements. However, the FDA had expressed concern over efforts by pharmacists and other drug providers to manufacture drugs under the guise of compounding. In 1992, the FDA issued a Compliance Policy Guide ("CPG") that reflected the FDA's policy regarding efforts to manufacture drugs without obtaining FDA approval. The CPG set forth nine factors the FDA used to determine whether a drug provider's efforts to produce a particular drug justified the FDA's exercise of enforcement action under the FDC Act. These factors included "[s]oliciting business (e.g., promoting, advertising, or using sales persons) to compound specific drug products, product classes, or therapeutic classes of drug products," and "[d]istributing inordinate amounts of compounded products out of state." CPG at 153–54, attached as Exhibit A to Defendants' Motion for Summary Judgment. The CPG explained that such actions were more consistent with manufacturing than compounding, and enforcement of FDA regulations was thus necessary to prevent the "very real potential for causing harm to the public health when drug products are manufactured and distributed in commercial amounts without FDA's approval." CPG at 152.

In 1997, Congress formally recognized this policy by enacting the Modernization Act of 1997. Under the Modernization Act, pharmacists are free to produce compounded drugs without meeting the FDA's restrictive regulations, as long as

---

**2.** "New drug" is defined as "any drug ... generally recognized ... as safe and effective for use under the conditions prescribed...." 21 U.S.C. § 321(p). To obtain FDA approval of a new drug, the manufacturer must demonstrate to the FDA that the drug is safe and effective for each of its purported uses. 21 U.S.C. § 355(b).

they satisfy several conditions. First, under subsection (a), the drug product must be compounded "for an identified individual patient based on the unsolicited receipt of a valid prescription order." Subsection (b) imposes numerous standards on the quality of the ingredients of the compounded drug, requiring, *inter alia*, that the drug product be compounded from a list of approved drug substances that have not been deemed unsafe or inappropriate for compounding. Finally, under subsection (c), a drug may be compounded "only if the pharmacy, licensed pharmacist or licensed physician does not advertise or promote the compounding of any particular drug, class of drug, or type of drug."

On November 19, 1998, Plaintiffs filed their Complaint and Motion for Temporary Restraining Order, seeking injunctive and declaratory relief. They contended that because §§ 353a(a) and (c) allow pharmacists to compound drugs only if they forego the advertising and promotion of their products, these subsections represent an unconstitutional condition in violation of the free speech clause of the First Amendment. On November 20, 1998, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction, requesting that the court enjoin the enforcement of the speech-related restrictions in §§ 353a(a) and (c). On December 18, 1998, after an evidentiary hearing held on December 4, 1998, the court granted Plaintiffs' Motion in part and temporarily restrained the Government from enforcing § 353a ("TRO Order"). The parties stipulated to the extension of the TRO Order, pending resolution of the Summary Judgment Motions addressed here.

## II. *STANDARD OF REVIEW*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered when:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the initial burden of "identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The movant must be able to show "the absence of a material and triable issue of fact," *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir.1987), although it need not necessarily advance affidavits or similar materials to negate the existence of an issue on which the nonmoving party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. *But cf., id.,* at 328, 106 S.Ct. 2548 (White, J., concurring).

If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support his legal theory. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 282 (9th Cir.1979). The opposing party cannot stand on his pleadings, nor can he simply assert that he will be able to discredit the movant's evidence at trial. *See T.W. Elec.,* 809 F.2d at 630. Similarly, legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Moreover, "if the factual context makes the nonmoving party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show

that there is a genuine issue for trial." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics,* 818 F.2d 1466, 1468 (9th Cir.1987), (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (original emphasis).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Eisenberg,* 815 F.2d at 1289.

However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec.,* 809 F.2d at 631. Also, inferences from the facts must be drawn in the light most favorable to the nonmoving party. *Id.* These inferences may be drawn both from underlying facts that are not in dispute, as well as from disputed facts which the judge is required to resolve in favor of the nonmoving party. *Id.*

## III. *DISCUSSION*

In their Complaint, Plaintiffs argue that the restrictions on advertising and promoting compounded drugs contained in subsections (a) and (c) of the Modernization Act violate Plaintiffs' First Amendment rights to free speech. They challenge these sections on two bases: 1) they are unconstitutional on their face; and 2) they are unconstitutional as applied to Plaintiffs.

Defendants advance two arguments in support of the instant Motion for Summary Judgment. First, they contend that Plaintiffs lack standing to bring their "as-applied" challenge to § 353a, as they have not demonstrated that it either has been or will be applied to them. Second, they argue that § 353a is a valid limitation on Plaintiffs' free speech rights, and therefore, does not violate the First Amendment. The court begins with the preliminary issue of standing, and then turns to the constitutionality of § 353a.

### A. *Standing*

■ A plaintiff may challenge a regulation, ordinance or other government action on the grounds that it is unconstitutional on its face or unconstitutional as it applies to the plaintiff. *Bd. of Trustees of the State Univ. of New York,* 492 U.S. 469, 482, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *Gaudiya Vaishnava Society v. City of Monterey,* 7 F.Supp.2d 1034, 1041 (N.D.Cal.1998). An ordinance will be deemed facially unconstitutional in either of two cases: "[E]ither ... it is unconstitutional in every conceivable application, or ... it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad." *Members of City Council v. Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (*"Vincent"*). Where a regulation implicates only commercial speech, however, parties may generally not lodge a facial challenge to a regulation of commercial speech on overbreadth grounds. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Washington Mercantile Ass'n v. Williams,* 733 F.2d 687, 689 (9th Cir.1984). Therefore, Plaintiffs' facial challenge must be made on the ground that § 353a is unconstitutional in "every conceivable application."

Plaintiffs may also challenge the constitutionality of a statute as it applies to them. "An as-applied challenge contends that the law is unconstitutional as applied

to the litigant's particular speech activity, even though the law may be capable of valid application to others." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). "A determination that an ordinance's application is unconstitutional as applied to a particular plaintiff does not necessarily render the ordinance invalid, it only invalidates the particular application of the ordinance." *Gaudiya Vaishnava Society v. City of Monterey*, 1041 (N.D.Cal.1998).

■ Whether a party asserts a facial or as-applied challenge, Article III of the United States Constitution requires that there be an actual case or controversy before the court. *See Flast v. Cohen*, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). To satisfy the case or controversy requirement, plaintiffs must demonstrate that they have suffered an actual or threatened injury as a result of the challenged conduct and that the injury will be redressed by a favorable decision. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). A party who fails to meet this requirement lacks standing to bring its claims. *See Secretary of State of Maryland v. Munson*, 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984).

In this case, Plaintiffs advance a "pre-enforcement" challenge to § 353a, explaining that they intend to engage in conduct that will put them within the statute's reach and § 353a thus poses a threat of injury. Defendants do not contest Plaintiffs' right to bring a *facial* pre-enforcement challenge. Defendants argue, however, that Plaintiffs may not assert an as-applied challenge because the statute has not actually been applied to them. Thus, at bottom, Defendants contend that facial pre-enforcement challenges and as-applied pre-enforcement challenges are subject to different standing requirements.

■ Courts discussing standing to bring "pre-enforcement" challenges have not typically differentiated between as-applied and facial challenges. Rather, they have concluded generally that standing to bring a pre-enforcement challenge exists when the "plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *see also Doucette v. City of Santa Monica*, 955 F.Supp. 1192 (C.D.Cal. 1997).

The Ninth Circuit has explained that unless a plaintiff lodges an overbreadth attack, which permits the plaintiff to assert the interests of third parties, the plaintiff must meet traditional standing requirements. *N.A.A.C.P., Western Region v. City of Richmond*, 743 F.2d 1346, 1352 (9th Cir.1984). In *N.A.A.C.P.*, the court explicitly held that facial challenges alleging overbreadth allow "courts to ignore the prudential rule that a litigant has standing to vindicate only his own constitutional rights," because such a challenge asserts that the statute "will chill the protected speech of third parties." *Id.* at 1352. In contrast, the court explained that a "quite different" type of facial challenge is one that seeks relief on the ground that the statute is unconstitutional because it "restricts protected activity in every conceivable application." *Id.*, *quoting Munson*, 467 U.S. at 964, 104 S.Ct. 2839. In the latter case, "[b]ecause the plaintiff asserts his own injury as the basis for judicial relief ... the court can entertain his claim without departing from traditional standing concerns." *Id.* Thus, under *N.A.A.C.P.*, a facial challenge attacking a statute in "every conceivable application" is subject to the same traditional standing requirements applied to as-applied challenges.

In both their facial and their as-applied challenge, then, in order to establish standing, Plaintiffs must allege first that they have "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and second, that "there exists a credible threat of prosecution." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Because Plaintiffs have so alleged, as Defendants do not dispute, they are entitled to challenge § 353a both facially and as applied to them. *See also Foti*, 146 F.3d at 635 (concluding that "[i]nadequate evidence of the City's alleged discriminatory enforcement of the ordinance does not defeat their as-applied challenge").

While Plaintiffs do have standing to bring either type of challenge to § 353a, however, there is no substantive distinction in this case between Plaintiffs' two challenges, as Plaintiffs have not identified any unusual application of § 353a to their specific circumstances. On the contrary, they appear to lodge a broad challenge to the constitutionality of the general application of § 353a:

> Plaintiffs, both in writing and orally, have advertised, promoted, and solicited their compounded drugs for a long time prior to the enactment of Section 353a. Plaintiffs intend and need to continue to advertise, promote and solicit compounded drugs. Moreover, while the FDA argues that it has not "applied or enforced [Section 353a] against plaintiffs or any other individual or group" ..., the FDA has "not indicated that [it] will not enforce the advertisement ban found in [§ 353a]."

Thus, Plaintiffs simply present themselves as typical parties who may be harmed by the application of § 353a. Thus, Plaintiffs' as-applied challenge is subsumed by their facial challenge, and any conclusion by this court that § 353a is unconstitutional as applied to Plaintiffs would also entail the conclusion that § 353a is unconstitutional "in every conceivable application." *See also Gaudiya Vaishnava Society*, 7 F.Supp.2d at 1043 n. 6 (concluding that where the plaintiff "failed to offer any evidence that the ... Ordinance is unconstitutional in the manner in which it was applied to [the plaintiff's] particular speech activity, a necessary element of an as-applied challenge," the court's conclusions with respect to the plaintiff's facial and as-applied challenges apply with equal force to both arguments).

### B. *Constitutionality of § 353a*

Plaintiffs challenge two subsections of § 353a. The first of these is contained in 353a(a), which requires that a prescription for the particular compounded drug be unsolicited and that it be prepared for an identified patient. That section provides:

> Sections 351(A)(2)(B), 352(f)(1), and 355 of this title shall not apply to a drug product if the drug product is compounded for an identified individual patient based on the *unsolicited* receipt of a valid prescription order or a notation, approved by the prescribing practitioner, on the prescription order that a compounded product is necessary for the identified patient.

(emphasis added). Subsection (c) of § 353a imposes a similar condition on the exemption, prohibiting any advertising and promotion of particular compounded drugs:

> A drug may be compounded under subsection (a) of this section only if the pharmacy, licensed pharmacist, or licensed physician *does not advertise or promote the* compounding of any *particular drug, class of drug, or type of drug.* The pharmacy, licensed pharmacist, or licensed physician *may advertise and promote* the compounding *service* provided by the licensed pharmacist or licensed physician.

21 U.S.C. § 353a(c) (emphasis added). Taken together, subsections (a) and (c) of § 353a establish that pharmacists may compound drugs without being subject to the requirements of the Act, if 1) the compounded drug is prepared for an individual patient in response to an unsolicited prescription from a physician, and 2) the pharmacist refrains from advertising or promoting the compounding of particular drugs.

Plaintiffs argue § 353a(a) and (c) impermissibly infringe on protected rights under the First Amendment. The parties agree that the speech implicated by these sections is limited to commercial speech, and the applicable test is therefore that set forth in *Central Hudson.* Such speech represents "expression related solely to the economic interests of the speaker and its audience," *see Central Hudson Gas & Electric Corp. v. Pub. Service Comm'n of New York,* 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and "does no more than propose a commercial transaction." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 752, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

It is well-settled that "[t]he First Amendment ... protects commercial speech from unwarranted governmental regulation." *Valley Broadcasting Co. v. United States,* 107 F.3d 1328, 1330 (9th Cir.1997) (*citing Central Hudson,* 447 U.S. at 561–62, 100 S.Ct. 2343). However, "[i]f commercial speech only is threatened, the requirements of the First Amendment are less rigorous." *Washington Mercantile,* 733 F.2d at 689. "The law has developed to ensure that advertising provides consumers with accurate information about the availability of goods and services." *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 496, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). Consistent with this ideal, courts have encouraged and protected commercial speech, but have limited that

protection to "the dissemination of truthful and nonmisleading commercial messages about lawful products and services." *Id.* (*citing* Kozinski & Banner, *The Anti–History and Pre–History of Commercial Speech,* 71 Tex.L.Rev. 747 (1993)).

In *Central Hudson,* the Supreme Court articulated the applicable test to evaluate the constitutionality of government regulations limiting commercial speech. The four-part *Central Hudson* test reflects a "more relaxed inquiry" than that applied to restrictions of non-commercial speech. *Ass'n of Nat'l Advertisers, Inc. v. Lungren,* 44 F.3d 726, 728–29 (9th Cir.1994). The test provides:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566, 100 S.Ct. 2343. "Under this intermediate scrutiny, the asserted governmental interest must be 'substantial,' rather than 'compelling,' and the regulation adopted must 'directly advance' this interest, rather than be 'precisely drawn.'" *Lungren,* 44 F.3d at 729 (*citing Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343).

■ The Central Hudson test can be distilled into four discrete questions: 1) As a threshold matter, is the targeted speech constitutionally protected; 2) has the Government asserted a "substantial" governmental interest; 3) does the regulation "directly advance" the asserted interest; and 4) is the restriction more extensive than necessary to achieve the asserted governmental interest. If factor (1) is an-

swered in the affirmative, the court must proceed to an analysis of the three remaining factors to determine whether the statute is justified by the asserted governmental interest it purportedly serves.

1. *Is the Speech Targeted by § 353a Constitutionally Protected?*

The first factor of the *Central Hudson* test directs the court to analyze whether, as a threshold matter, the speech in question is protected by the First Amendment. Under *Central Hudson,* "for commercial speech to come within that provision, it must at least concern lawful activity and not be misleading." 447 U.S. at 566, 100 S.Ct. 2343.

■ In this case, Defendants do not argue that the restrictions at issue involve illegal activity; rather, they contend that the targeted speech is misleading and may be restricted on that basis. Courts have divided the "misleading" element of the *Central Hudson* test into two categories: "inherently" misleading and "potentially" misleading. If speech is "inherently" misleading, it may be restricted without reference to the remaining three *Central Hudson* factors. To evaluate whether speech is "inherently misleading," courts will consider whether the speech is "more likely to deceive the public than to inform it," *Central Hudson,* 447 U.S. at 563, 100 S.Ct. 2343; whether there are substantial "possibilities for deception," *Friedman,* 440 U.S. at 13, 99 S.Ct. 887; whether experience has shown that such advertising is subject to abuse, *In re R.M.J.,* 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982); and whether the intended audience has the ability to evaluate the claims made. *Id.* Because inherently misleading speech carries substantial social harms, and the state obviously has a compelling interest in preventing such harms, speech that is inherently misleading may be regulated on that basis alone. *See In re R.M.J.,* 455 U.S. at 203, 102 S.Ct. 929.

If speech is merely "potentially" misleading, however, it may not be proscribed under the commercial speech test without analysis under the remaining three factors. "If the protections afforded commercial speech are to retain their force we cannot allow rote invocation of the words potentially misleading to supplant [the government's burden]." *Ibanez v. Florida Dep't of Bus. and Prof'l Regulation,* 512 U.S. 136, 146, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994) (internal citations and quotation marks omitted). Where the speech may or may not be misleading in any given case, it is only "potentially" misleading, and may not be subject to a blanket prohibition. *Lungren,* 44 F.3d at 731–32. In such cases, courts should evaluate a speech restriction "focusing on its potential for deception in light of the lessons of experience and the nature of the target audience." *Id.* at 732.

Here, Defendants contend that the speech at issue is inherently misleading, and thus may be prohibited without regard to the remaining *Central Hudson* factors. In the alternative, they argue that the speech is at least potentially misleading, and that the Government is therefore allowed greater deference in its regulation.

Defendants first argue that "[b]y their very nature," advertisements for compounded drugs "make express and implicit statements" about the safety and effectiveness of such drugs. They further claim that "[b]ecause compounded drugs have not been shown to be safe and effective under the Act's longstanding and universally recognized scientific standards, advertisements, promotions, and solicitations involving particular unapproved compounded drugs are inherently misleading because they suggest that these unapproved drugs have therapeutic value."

■ Two considerations counsel the court to conclude that the speech targeted by the restrictions at issue is not "inher-

ently misleading." First, there is no evidence in this case that the prohibited statements contain any information that is actually false. On the contrary, Plaintiffs seek to provide truthful information about their compounding services, the various compounded drugs they produce, and in some cases, research materials on the safety and effectiveness of the particular compounded drug. There is no false information in any of Plaintiffs' promotions, a fact that Defendants do not dispute. Defendants' unsupported assertion that the public will be misled into believing, by implication alone, that compounded drugs have passed FDA tests and been approved, is insufficient to warrant the conclusion that the restricted speech is "inherently misleading."

Defendants' own statement illustrates that the speech at issue is not inherently misleading. Defendants assert that the targeted speech is inherently misleading "because they suggest that these unapproved drugs have therapeutic value." Yet Defendants themselves presumably believe that compounded drugs have therapeutic value in some cases; otherwise, they would prohibit the unapproved use of such drugs altogether. Thus, even if it is true, as Defendants argue, that the promotion of compounded drugs suggests that they have therapeutic value, according to Defendants' own argument, this is frequently an accurate and truthful claim about the drug's benefits.

Defendants rely on *United States v. An Article . . . Acu–Dot*, 483 F.Supp. 1311, 1315 (N.D.Ohio 1980) for the proposition that advertisements of unapproved drugs, such as the compounded drugs at issue here, are inherently misleading because they falsely indicate that the drugs have obtained FDA approval and that the drugs are therefore safe and effective. Defendants' reliance on *Acu–Dot*, however, is misplaced. There, the defendants were manufacturers of a "small, pin-head sized

magnet attached to the underside of a circular, adhesive patch," which was designed to work as a minor pain reliever. The defendants marketed the product as useful "[f]or temporary relief of occasional minor aches and pains of muscles and joints." 483 F.Supp. at 1312. The FDA brought suit against the defendants, claiming that the product had only a placebo effect, and therefore, the defendants' promotional statements about the product were misleading. The FDA relied on the testimony of several experts who testified that "the devices could not achieve the effect alleged by the labeling, other than through a placebo effect." 483 F.Supp. at 1313. The defendants apparently did not dispute that the drugs had only a placebo effect, but contended that the placebo effect was sufficient to warrant the defendants' claims regarding the drugs' health benefits.

The court disagreed. The court emphasized that the device itself could not provide the benefits claimed in the advertisement; all physical benefits enjoyed by its users stemmed from a mental response to using the device. The court concluded that "the device often can achieve its claims of providing 'temporary relief of occasional minor aches and pains of muscles and joints'; but this effect is the result of nothing more than sophisticated marketing chicanery." 483 F.Supp. at 1314. On these facts, the court held that the marketer's claim that the device itself provided temporary relief of minor aches and pains was false, and thus also "misleading."

Here, there is neither evidence nor argument that Plaintiffs will attribute therapeutic benefits to their products that the products themselves are unable to provide. Defendants simply assert that their promotions "imply," by omitting certain facts, that compounded drugs have obtained FDA approval. This assertion, without more, is clearly inadequate to warrant the

conclusion that the commercial speech targeted by § 353a is "inherently misleading."

A second consideration militating against the conclusion that the speech is inherently misleading is that to the extent the targeted speech may have the potential to mislead, that misleading element can be reduced or removed altogether by the use of a narrower restriction. Were the FDA attempting to prevent the public from being misled by the implication that compounded drugs had been approved by the FDA, it could simply require pharmacists to include a disclaimer on their advertisements indicating that FDA approval had not been obtained.[3]

A plurality of the United States Supreme Court reached a similar conclusion in *Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990). There, the Attorney Registration and Disciplinary Commission of Illinois brought disciplinary proceedings against the plaintiff under a rule prohibiting attorneys from representing themselves to the public as specialists. The plaintiff, an attorney, was licensed to practice law in Illinois and other states, and also had obtained a "Certificate in Civil Trial Advocacy" from the National Board of Trial Advocacy. In his letterhead, the plaintiff stated his name, which was followed by a notation that read "Certified Civil Trial Specialist By the [Board]," and another notation that read "Licensed: Illinois, Missouri, Arizona." The Commission asserted that by listing these pieces of information in this way, the plaintiff implied to the public that he was a certified legal specialist. The Illinois Supreme Court agreed, holding that the First Amendment did not protect the plaintiff's letterhead because the public could confuse the State and the Board as the sources of the plaintiff's certification and his license to practice.

The Supreme Court reversed. The Court explained that a state may prohibit inherently misleading speech entirely, but it cannot impose an absolute prohibition if the information may be presented in a non-misleading manner. The Court emphasized that "[t]he facts stated on petitioner's letterhead are true and verifiable," and that there was no contention that "any potential client or person was actually misled or deceived" by the restricted speech. The Court recommended that as an alternative to a broad prohibition, the defendants could require a disclaimer to ensure that complete information about attorneys' qualifications was provided to the public. It could not, however, broadly proscribe truthful information whose negligible misleading content could be remedied by providing more information. *See also Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 772 n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (noting that the state may regulate a commercial message so that it will "appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive"); *Nutritional Health Alliance v. Shalala*, 953 F.Supp. 526, 528 (S.D.N.Y. 1997) (concluding that health claims not approved by the FDA are not inherently misleading where "at least some can be presented in a non-misleading fashion").

In *Washington Legal Foundation v. Friedman*, 13 F.Supp.2d 51 (D.D.C.1998) ("*WLF*"), the court applied the same reasoning to a case involving FDA regulations. There, a public interest group sought to enjoin the enforcement of government restrictions regulating the promotion and advertisement of "off-label"

---

**3.** A required disclaimer on each advertisement or solicitation indicating that the particular compounded drug has not been tested or approved by the FDA as safe and effective would satisfy this goal.

uses for prescription drugs.[4] The FDA argued that statements promoting off-label uses not approved by the FDA are "inherently misleading."

The court rejected the FDA's argument, which it characterized as one claiming that "any and all scientific claims about the safety, effectiveness, contraindications, side effects, and the like regarding prescription drugs are presumptively untruthful or misleading until the FDA has had the opportunity to evaluate them." 13 F.Supp.2d at 67. It stated that the FDA "exaggerate[d] its overall place in the universe" by arguing that promotion of off-label drugs was "untruthful or inherently misleading merely because the FDA ha[d] not yet had the opportunity to evaluate the claim." 13 F.Supp.2d at 67. The court concluded that the targeted statements about off-label uses were not "inherently misleading," because "at least some can be presented in a non-misleading fashion." *Id.* (quoting *Nutritional Health Alliance v. Shalala*, 953 F.Supp. 526, 528 (S.D.N.Y. 1997)).

As indicated earlier, if the FDA believed that the targeted statements in this case were likely to mislead, it could simply require that pharmacists compounding drugs include disclaimers in their advertisements, clarifying that the compounded drug had not passed the FDA approval process required of new drugs. In doing so, any potential the targeted speech may have to mislead the public would be prevented, with no violence done to free speech. The availability of such a reasonable alternative restriction militates against the conclusion that the speech at issue is "inherently misleading."

The court therefore concludes that the speech at issue in this case is not inherently misleading, and thus may not be prohib-

ited without reference to the remaining *Central Hudson* factors. The court recognizes, however, that the targeted promotional statements have the potential to mislead, because consumers may, under certain circumstances, believe that the drugs have survived the rigorous testing and labeling requirements imposed on new drugs. "[T]he government may have more leeway" in restricting commercial speech when there is the potential to mislead on issues involving public health. *Pearson v. Shalala*, 164 F.3d 650, 659 (D.C.Cir.1999). However, "it must still meet its burden of justifying a restriction on speech." *Id.* If there is any likelihood that "truthful and nonmisleading expression will be snared along with ... deceptive commercial speech, the State must satisfy the remainder of the Central Hudson test by demonstrating that its restriction serves a substantial state interest and is designed in a reasonable way to accomplish that end." *Id.* at 768–69. Thus, the court must proceed to an analysis of the remaining factors to evaluate the constitutionality of § 353a, cognizant of the fact that the speech targeted by the restrictions are "potentially misleading," and "focusing on its potential for deception in light of the lessons of experience and the nature of the target audience." *Lungren*, 44 F.3d at 732.

### 2. Does the Government assert a Substantial Government Interest?

In this case, Defendants allege that three substantial interests are served by § 353a. First, Defendants point to the general goal of protecting the public health and safety. Plaintiffs do not dispute, as they cannot, that this is a substantial government interest entitled to federal protection. The Supreme Court has clearly stated that "the Government has a significant

---

4. "Off-label" uses involve using an FDA-approved drug for uses that have themselves not been approved, such as treating a condition not indicated on the label or treating the indicated condition but varying other factors, such as the dosing regimen.

interest in protecting the health, safety, and welfare of its citizens." *Rubin*, 514 U.S. at 485, 115 S.Ct. 1585. Thus, the court agrees with Defendants that its goal of serving the public health and safety meet the substantial government interest request.

Defendants also assert two more specific goals allegedly advanced by the statute. Defendants contend first that § 353a serves the goal of maintaining the integrity of the drug approval process. The court agrees that this interest is substantial. Congress has declared that all new drugs must be tested and approved by the FDA. The purpose of this requirement is to ensure that new drugs introduced into the market meet basic standards of safety and effectiveness. The FDA's approval gives consumers important information to evaluate a particular drug, and the integrity of this process is clearly necessary to its effectiveness and reliability. *See also WLF*, 13 F.Supp.2d at 71 (concluding that encouraging manufacturers of approved drugs to subject off-label uses to the drug approval process is a substantial governmental interest).

Finally, Defendants argue that they have a substantial interest in balancing "the continued availability of compounded drug products as a component of individualized drug therapy, while limiting the scope of compounding so as to prevent manufacturing under the guise of compounding." Defendants' Motion at 20. The Supreme Court has confirmed that the government's effort to balance competing goals may be a substantial interest worthy of governmental protection. *See United States v. Edge Broadcasting Co.*, 509 U.S. 418, 428, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993) ("Edge") (concluding that the "congressional policy of balancing the interests of lottery and nonlottery States is the substantial governmental interest that satisfies *Central Hudson*"). However, a finding that Defendants' asserted interest in balancing its competing goals requires a finding by this court that the competing goals themselves are substantial.

With respect to the first of these competing goals, Plaintiffs themselves echo Defendants' claim that individual patients may benefit from the compounding of particular drugs to accommodate unique needs, such as age differences, allergies or unusual dosages. The court therefore agrees that the government has a substantial interest in ensuring the continued availability of compounded drugs for use by individual patients.

The court is not convinced, however, that Defendants have a substantial interest in preventing "compounding under the guise of manufacturing." Defendants have offered no definition of either manufacturing or compounding, apparently because the Modernization Act itself offers no such definition. Thus, there is no coherent way for this court to determine whether Defendants have a substantial interest in encouraging one while limiting the other. In their argument, Defendants appear to equate high volume distribution with manufacturing and low volume distribution with compounding. In their Motion, they insist that they must "limit the volume of compounding because of the increased health risks associated with a large number of patients receiving drugs that are not subject to the same quality control standards that apply to ordinary manufactured drugs." Defendants' Motion at 21. This framework, however, obviously cannot support Defendants' asserted interest in preventing compounding allegedly done under the guise of manufacturing. First, it does nothing to clarify the difference between manufacturing and compounding. Furthermore, even were the distinction clear, this argument neither explains nor supports the contention that there are "increased health risks associated with a large number of patients" receiving com-

pounded drugs, but that compounded drugs in small quantities produce an overall benefit to the public health.

If, on the other hand, Defendants believe that the relevant distinction is between those drugs that are FDA approved and those that are not, the court agrees that the FDA has a legitimate interest in preventing pharmacists from circumventing FDA requirements by changing the description of their products. To the extent this is the basis for Defendants' distinction, the court agrees that it is substantial. The problem with this argument is that without more, it ultimately reduces to equating manufacturing with approved drugs and compounding with unapproved drugs. At that point, any interest Defendants assert in making compounded drugs available to individual patients is no longer tenable. Therefore, on the facts before it, the court is unable to either identify or acknowledge the significance of the distinction between manufactured and compounded drugs.[5] For this reason, it cannot agree with Defendants that the Government has a substantial interest in achieving the imprecise and undefined balance it purportedly seeks here.

The court thus concludes that Defendants' asserted interests of protecting the public health and safety and preserving the integrity of the FDA approval process are substantial and worthy of protection under *Central Hudson.* However, Defendants third asserted interest of balancing the need for compounded drugs in individual cases against the goal of preventing manufacturing under the guise of compounding is insufficiently clear in this case to constitute a substantial governmental interest. For these reasons, whether § 353a withstands constitutional scrutiny turns on whether 1) it directly advances the government's goals of protecting the public health and welfare, and preserving the integrity of the FDA drug approval process, and 2) it is narrowly tailored to accomplish these goals.

3. *Does the Regulation "Directly Advance" the Governmental Interests Asserted?*

 Under the third factor, the court examines whether the regulation at issue "directly advance[s] the state interest involved." *Central Hudson,* 100 S.Ct. at 2350. Under this test, "the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Id.* Rather, to satisfy this requirement, "the government must demonstrate that 'its restrictions will in fact alleviate [the asserted harms] to a material degree.'" *Valley Broadcasting Co. v. United States,* 107 F.3d 1328, 1334 (9th Cir.1997) (*quoting Edenfield v. Fane,* 507 U.S. 761, 769, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)).

 In *Edenfeld,* the Supreme Court clarified that once the first two factors have been satisfied, the Government carries the burden of demonstrating that the

---

5. In reality, the practical difference in this case between Defendants' notion of manufacturing and compounding may actually be embodied by the precise issue the court must address in this order. Specifically, it appears that Defendants would label pharmacy-initiated drug combining as manufacturing, and patient- or physician-initiated drug combining as compounding. This frames the distinction by looking to whether the pharmacist or other drug producer advertised, promoted or otherwise initiated the sale and use of the particular drug product. Of course, to accept Defendants' distinction, and more importantly, to accept that Defendants have a substantial interest in preserving this distinction, is to agree that Defendants have a substantial interest in preventing pharmacists from advertising or promoting particular compounded drugs, because to allow such promotion would be to allow pharmacists to manufacture under the guise of compounding. This conclusion begs the question before the court, which is whether the speech restrictions contained in § 353a are legitimate.

challenged regulation advances the Government's interest "in a direct and material way." 507 U.S. at 767, 113 S.Ct. 1792. That burden "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 770–771, 113 S.Ct. 1792.

To satisfy this burden, Defendants advance the following argument: "The advertising restrictions in subsections (a) and (c) 'are intended to ensure that the volume of compounding does not approach that ordinarily associated with drug manufacturing.'" Defendants' Motion at 22 (*quoting* 143 Cong.Rec. S9840 (statement of Senator Kennedy)). Thus, at bottom, Defendants assert that the speech-related restrictions in § 353a are necessary to limit the volume of compounded drugs, thereby ostensibly protecting the public against the purported health risks associated with compounded drugs.

Defendants' argument fails to draw the necessary connection between their asserted interests on the one hand, and restricting the volume of compounded drugs on the other. Defendants concede that all compounded drugs must be prescribed by a physician, and they even encourage the use of compounded drugs for individual patients when the drugs are requested by a physician or patient. Thus, Defendants freely admit that making compounded drugs available in some number represents an overall benefit to the public health. However, as soon as the sale of the drug is encouraged by the pharmacist, Defendants insist that it poses a danger to the public health that warrants restriction.

The D.C. Circuit rejected an argument similar to Defendants' in *Pearson v. Shala-*

la, 164 F.3d 650 (D.C.Cir.1999). There, similar to the FDA's argument here, the FDA claimed that the public health would be advanced by prohibiting drug producers from making health claims about FDA-approved dietary supplements, where the health claims themselves had not been approved by the FDA. Rejecting the FDA's argument, the court stated:

> The government simply asserts its 'common sense judgment' that the health of consumers is advanced directly by barring any health claims not approved by the FDA. Because it is not claimed that the product is harmful, the government's underlying—if unarticulated—premise must be that consumers have a limited amount of either attention or dollars that could be devoted to pursuing health through nutrition, and therefore products that are not indisputably health enhancing should be discouraged as threatening to crowd out more worthy expenditures. We are rather dubious that this simplistic view of human nature or market behavior is sound, but, in any event, it surely cannot be said that this notion—which the government does not even dare openly to set forth—is a direct pursuit of consumer health; it would seem a rather indirect route, to say the least.

Similar to the defendants in *Pearson,* Defendants in this case have not claimed that compounded drugs, in and of themselves, are harmful. Quite the contrary, they assert a "substantial interest" in ensuring the availability of such drugs in limited quantities. Instead, Defendants assert that the *volume* of compounded drugs must be controlled to protect the public safety, with no argument as to why compounded drugs in greater quantity pose a higher risk to public safety.[6] Apparently, Defendants believe that as the volume of compounded drugs increases, the balance

---

**6.** It must be kept in mind that all dispensing of compounded drugs must be under a valid

prescription to an individual patient by a licensed physician.

shifts, so that the benefits of compounded drugs are outweighed by their costs. Defendants have produced no evidence that such a phenomenon is likely to occur.

The only argument put forth by Defendants that may support this implicit claim is their unsupported assertion that physicians and consumers are unable to evaluate the health claims about compounded drugs made by advertising pharmacists. Defendants concede that Plaintiffs regularly include research and studies in their promotional materials, but boldly insist nonetheless that "most practicing physicians do not have the time or the training to make independent assessments ... and reach an independent, objective conclusion as to the benefits, risks, safety and effectiveness of a particular compounded drug that has not undergone the approval process."

Several courts have considered and flatly dismissed Defendants' argument, rejecting the "paternalistic" view that suppression of truthful speech is necessary to protect physicians and consumers from their own misuse of truthful information. In *WLF*, for example, the court faced the similar question of whether the state could prohibit pharmacists from promoting off-label uses of approved drugs. The court rejected the government's assertion that a prohibition was necessary to prevent the misuse of drugs by physicians. It reasoned that "despite the FDA's occasional statements in its briefs to the contrary, physicians are a highly educated, professionally-trained and sophisticated audience. In making prescribing decisions, doctors want (and need) to know first and foremost if the drug is the most safe and effective means to treat the conditions suffered by the patients." *WLF*, 13 F.Supp.2d at 63. *See also 44 Liquormart*, 517 U.S. at 503, 116 S.Ct. 1495 (recognizing that "[t]he First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good").

Perhaps the most insightful rendering of this principle is that reflected in the Supreme Court's decision in *Virginia Bd. of Pharmacy*. There, the court struck down a Virginia statute prohibiting pharmacists from advertising their prices for prescription drugs. In reaching its conclusion, the court expressed its aversion to the use of suppression as a means to prevent "uninformed" individuals from misusing accurate information. The Court explained:

> There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them. If they are truly open, nothing prevents a "professional" pharmacist from marketing his own assertedly superior product, and contrasting it with that of the low-cost, high-volume prescription drug retailer. But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's. It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us.

*Id.* at 770, 96 S.Ct. 1817.

The court agrees that suppression of truthful and accurate information as a means to protect society from its own misuse is anathema to the principles of the First Amendment. Were the FDA concerned with serving public health by preventing the purported harms of compounded drugs, it could certainly find a more direct route to that end than traveling through the protected area of speech. There is no evidence on the record that

reducing the volume of compounded drugs will serve public health, and even if such evidence existed, broad prohibitions on truthful and accurate speech is an illegitimate method of achieving this goal.

Nor does § 353a directly advance the goal of preserving the integrity of the FDA approval process. If the FDA were concerned with ensuring that drug producers not avoid FDA regulations, it could easily require that all drugs, including compounded drugs, obtain FDA approval before being introduced into the stream of commerce. This would certainly be a more "direct" route to maintaining the integrity of the approval process. In actuality, there appears to be no logical connection between the regulation of speech on the one hand and the preservation of the integrity of the FDA's drug approval process on the other. The remaining sections of § 353a, which regulate the ingredients that may be used and limit the total amount of compounded drugs that may be distributed, would seem to more directly achieve those goals.

Furthermore, even if § 353a did not suffer from these flaws, given the substantial exceptions to its application that dramatically limit its reach, this court cannot conclude that § 353a directly advances the FDA's asserted interests. Pharmacists are free to advertise compounded *services,* as long as they do not advertise "any particular drug, class of drug, or type of drug." Thus, a pharmacy may advertise its compounding experience, including promotional activities at educational, professional and trade meetings, likely increasing the overall volume of compounded drugs, as long as it does not promote the compounding of any particular drug or class of drugs.

Section 353a also does not prohibit consultations between the compounding pharmacist and patients or physicians. By its terms, § 353a specifically allows a compounded drug to be based on either an unsolicited prescription or "a notation, approved by the prescribing practitioner, on the prescription order that a compounded product is necessary for the identified patient." 21 U.S.C. § 353a(a). The provision permits a pharmacist to call a physician, after a patient has presented a prescription that indicates a compounded product may be desirable, to discuss the possibility of prescribing a compounded product. Thus, the statutory scheme essentially bars pharmacists from promoting particular drugs, but leaves them free to either advertise compounding services generally or initiate discussions with physicians or patients regarding particular compounded products needed by individual patients. It is difficult to see how the communication of the same information can both serve and undermine the public health, depending on which party initiates the contact or the method used to communicate it.

Finally, if Defendants are concerned with limiting the volume of compounded drugs, as they allege, § 353a(b)(3) would appear to undermine that goal, because it explicitly permits compounded drugs to constitute up to 5% of interstate drug distributions, and 100% of intrastate drug distributions. Moreover, if a pharmacist has a Memorandum of Understanding ("MOU") with the Secretary of Health and Human Services, it can distribute as much as 20% of its total interstate drug distributions in the form of compounded drugs. For a large pharmacy such as Payless or Walgreens, this would permit the distribution of compounded drugs in substantial numbers, amounting to sales in the millions of dollars.

In *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995), the court relied on similar considerations to strike down a federal restriction on alcohol advertising, reasoning that there was "little chance" the restriction

could advance the government's asserted goal, where "other provisions of the same Act directly undermine[d] and counteract[ed] its effects." 514 U.S. at 489, 115 S.Ct. 1585. In the Supreme Court's recent decision in *Greater New Orleans Broadcasting Ass'n v. United States,* 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999), the Court reached the same conclusion. There, the Court struck down a federal ban on gambling advertising, in part, because its application was riddled with exceptions, making it ineffective in serving its purported purpose. The Court explained that "[t]he operation of § 1304 and its attendant regulatory regime is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it." 527 U.S. at ——, 119 S.Ct. at 1925. Similarly, in this case, Defendants' primary purpose for § 353a—limiting the volume of compounded drugs in order to serve the public health—is undercut by the exceptions allowed in its own provisions. Under these circumstances, § 353a does not "directly advance" Defendants' asserted interests.

The court therefore finds that the speech-related restrictions contained in § 353a do not directly advance the Government's asserted interests, as required by the third *Central Hudson* factor. However, even were the court to conclude that the statute could satisfy this requirement, § 353a is also flawed because it fails the fourth factor of the *Central Hudson,* in that it is not narrowly tailored to achieve its stated purposes.

### 4. Is the Speech Restriction more Extensive than Necessary to Serve the Interests that Support it?

Under the fourth *Central Hudson* factor, the court must consider whether the restriction is "more extensive than is necessary to serve [the asserted state] interest." *Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. "The fourth part of the test complements the direct-advancement inquiry of the third, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it." *Greater New Orleans,* 527 U.S. at ——, 119 S.Ct. at 1932.

Nearly twenty years after *Central Hudson* was decided, in the face of a disagreement over the appropriate interpretation of the fourth *Central Hudson* factor, the Supreme Court revisited the issue in *Bd. of Trustees of the State Univ. of New York v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). In *Fox,* the Court explained that contrary to the holdings of several circuits, the fourth factor does not require that a restriction be "absolutely the least severe that will achieve the desired end." Rather, what is required is a

'fit' between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the ends served; that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.

*Fox,* 492 U.S. at 480, 109 S.Ct. 3028 (*quoting Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986)). While giving more deference to the state, the *Fox* Court noted at the same time that restrictions previously struck down under the *Central Hudson* test were usually "substantially excessive, disregarding 'far less restrictive and more precise means.'" *Fox,* 492 U.S. at 479, 109 S.Ct. 3028.

The Ninth Circuit subsequently considered the implication of *Fox* in *Project 80's, Inc. v. City of Pocatello,* 942 F.2d 635, 637 (9th Cir.1991). Interpreting the *Fox* Court's holding, the Ninth Circuit stated that in order to find a "reasonable fit" between the state regulation and its

asserted interest, the court must conclude that the regulation is "narrowly tailored to serve substantial governmental interests." *Project 80's*, 942 F.2d at 637. The court reasoned:

> By pointing out the alternatives available to the cities to advance their interests, we do not impose a least restrictive means requirement. Rather, we conclude, as did the Supreme Court in Fox, that restrictions which disregard far less restrictive and more precise means are not narrowly tailored.

942 F.2d at 638. Thus, where there are "far less restrictive and more precise means" that will achieve the desire end, the fourth factor under *Central Hudson* is not satisfied. *Id.; see also Cal–Almond, Inc. v. United States Dep't of Agriculture*, 14 F.3d 429, 440 (9th Cir.1993) (striking down advertising regulations that were "more extensive than necessary to serve the interest" asserted).

■ Applying this test to the instant case, it is clear that § 353a is not "narrowly tailored." As previously noted, were the FDA merely concerned with protecting the public from being misled about whether a drug has been FDA approved, it could require disclaimers to prevent any potential for confusion. The disclaimers could specifically state that the compounded drugs being advertised had not been subjected to the FDA's drug approval process. Included in these disclaimers could be statements about the costs and benefits of compounded drugs. The FDA could even require pharmacists to indicate that compounded drugs are intended for the specific needs of individual patients that cannot be met with approved manufactured drug products.

In *Pearson*, the court held that the FDA was required to consider disclaimers as an alternative to an outright ban on advertising. The court reviewed several recent Supreme Court cases "repeatedly pointing

to disclaimers as constitutionally preferable to outright suppression." 164 F.3d at 657; *see Peel*, 496 U.S. at 110, 110 S.Ct. 2281; *R.M.J.*, 455 U.S. at 206 n. 20, 102 S.Ct. 929; *Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 478, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988). The court concluded that where a statute prohibits "incomplete" advertising, "the preferred remedy is more disclosure, rather than less." *Id.*, (citing *Bates v. State Bar of Arizona*, 433 U.S. 350, 376, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)). Here, too, Defendants could require disclaimers as an alternative to their prohibition on advertising compounded drugs, which would clearly represent a far less restrictive means to accomplish the FDA's asserted goals.

Alternatively, if Defendants' intention is to protect the public health and welfare and to preserve the integrity of the FDA approval process, and they believe that compounded drugs threaten these concerns, they could subject compounded drugs to the safety testing imposed on new drugs. While this would of course represent a broader restriction on the production of compounded drugs, it would not threaten the free speech interests implicated by § 353a.

■ Courts have repeatedly held that where the benefits reaped by restrictions on speech could be obtained through nonspeech restrictions, speech restrictions should be viewed with great suspicion. *See, e.g., Greater New Orleans*, 527 U.S. at ——–——, 119 S.Ct. at 1934–35 ("It is well settled that the First Amendment mandates closer scrutiny of government restrictions on speech than of its regulation of commerce alone"); *see also 44 Liquormart*, 517 U.S. at 500, 116 S.Ct. 1495 (recognizing that "special concerns arise from regulations that entirely suppress commercial speech in order to pursue a nonspeech-related policy"). In its recent decision in *Greater New Orleans*, the

Court recognized the harms of restrictions that indiscriminately and unnecessarily capture innocent speech. The Court there held that the statute at issue was suspect because it "sacrifice[d] an intolerable amount of truthful speech about lawful conduct when compared to all of the policies at stake and the social ills that one could reasonably hope such a ban to eliminate." *Id.*

Thus, even were Defendants able to show that compounded drugs carry substantial health risks, and therefore that their volume should be limited, the proper remedy to such a problem is not broad prohibitions on truthful speech. The *Greater New Orleans* Court reminds us that "the power to prohibit or to regulate particular conduct does not necessarily include the power to prohibit or regulate speech about that conduct." 527 U.S. at ——, 119 S.Ct. at 1934 (citation omitted). In this case, there is no question that Congress has the authority, indeed the responsibility, to regulate the availability of potentially dangerous drugs. Where such an end can be achieved without reliance on speech restrictions, however, Congress cannot, consistent with the First Amendment, use protected speech to accomplish its task. As the Court in *44 Liquormart* recognized, "[t]he First Amendment makes clear that the Constitution presumes that attempts to regulate speech are more dangerous than attempts to regulate conduct." 517 U.S. at 511, 116 S.Ct. 1495.

In sum, by enacting § 353a, Defendants have impermissibly infringed on protected speech to advance interests that can be served through far less restrictive means. While Defendants have identified substantial government interests they seek to serve, § 353a does not directly advance these interests and is clearly not narrowly tailored to accomplish its purported goals. While the Government is given more deference in its regulation of commercial speech, this deference does not override the protections of the First Amendment, which prevent the unnecessary prohibition of truthful speech to achieve goals that may be served without implicating protected freedoms.

## C. *Severability*

Having concluded that the speech-related portions of §§ 353a(a) and (c) are unconstitutional, the court must now turn to the question of whether these sections may be severed from § 353a. It is well-settled that "a court should refrain from invalidating more of the statute then is necessary." *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (quoting *Regan v. Time, Inc.,* 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984)). "Whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." *Regan,* 468 U.S. at 652, 104 S.Ct. 3262 (citations omitted).

 Consistent with these principles, the Supreme Court has stated that if the constitutionally permissible portions of a statute are "fully operative as a law," the offending portions should be severed "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." *Immigration & Naturalization Service v. Chadha,* 462 U.S. 919, 931, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (quoting *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). Thus, only if the remainder of the statute is unable to operate independently as law, or it is clear that Congress would not have enacted the statute but for the impermissible portions, may the court invalidate the entire statute.

 In this case, there is no question that the offending portions of subsections

(a) and (c) can be severed from the remainder of § 353a. First, while extracting the speech-related provisions will certainly reduce the reach of § 353a, this modification will not render the statute unable to operate as law. The remaining portions of § 353a substantially limit and regulate pharmacists' production and distribution of compounded drugs. Subsection (b), for example, contains numerous requirements relating to the quality of the drug's ingredients and their effectiveness in compounding. Section 353a(b)(1)(A) requires that compounded drugs consist of drugs found on a list of "bulk drug substances," as defined in the Code of Federal Regulations. Section 353a(b)(1)(C) prohibits compounding of any drug ingredients that have been deemed unsafe or ineffective. Section 353a(b)(1)(D) prevents an individual from compounding "inordinate amounts [of] any drug products that are essentially copies of a commercially available drug product." Finally, § 353a(b)(3) limits pharmacists' distribution of compounded drugs to no more than 5%, or in some cases up to 20%, of the pharmacists' total interstate distribution of prescription orders. These remaining sections clearly represent independent requirements for the production of compounded drugs, allowing § 353a to be "fully operative as a law" even in the absence of the offending speech-related sections.

Furthermore, Defendants have presented no evidence that Congress would not have enacted § 353a in the absence of these provisions. Defendants simply point out that the exemption for compounded drugs in § 353a, by its terms, applies only if "the drug meets the requirements of this section." Defendants' Reply at 19. Defendants infer from this statement that Congress would not have exempted compounded drugs from the FDA's approval process in the absence of the speech-related sections.

The evidence, however, is to the contrary. As Defendants concede, prior to Congress' enactment of the Modernization Act, FDA testing and labeling requirements were not imposed on compounded drugs; the FDA exercised its enforcement discretion to permit pharmacists to compound drugs without meeting these stringent standards. It is difficult for this court to believe that after years of permitting pharmacists to compound drugs without satisfying the FDA's stringent standards, the Government would now enforce these standards in the context of compounding because one of its alleged protections—the restriction of advertising—is unavailable. There is no evidence on the record to support this assumption; indeed, the facts support the opposite conclusion. Therefore, the court finds that the speech-related portions of the § 353a are severable, leaving the remainder of the statute to operate as it was enacted.

### CONCLUSION

For the foregoing reasons, the court DENIES Defendants' Motion for Summary Judgment and GRANTS Plaintiffs' Cross–Motion for Summary Judgment, and enjoins the FDA from enforcing the speech-related restrictions contained in §§ 353a(a) and (c).

IT IS SO ORDERED.